Good morning, Your Honor. May it please the court, counsel. My name is Peter Schock. I represent Steve Hoffmeyer and Anthony Wicklund. This case is the one in which the plaintiffs or the appellants were in their houseboat. They saw the officer out in the middle of the river pointing binoculars. It was a disputed fact where they were pointed. And it was undisputed then that my clients came out and used epithets, filthy epithets, used the word communist. And then they went back in their houseboat. I have the officers. I recognize that every day. Their client points where he had to go and what he had to have. Your Honor, I can't hear you. You're asking about freebies. I have a little trouble hearing you. Your Honor, the problem is that I don't order freebies when I'm in charge of anything. It's a disputed fact, Your Honor. My clients assert that this particular officer, on many occasions, looked at their houseboat with binoculars. And they were irritated by it. They thought it was an intrusive act of government. The officer says the opposite. He said he'd never done it before. He'd never done it before. Well, I'll tell you a little bit about the developments that they had. I'm so sorry, sir. I can't hear you. Prevent the officers from looking at the houseboat? Absolutely not, sir. Absolutely not. He was looking at any member of the public who looked at the houseboat at that time. I want to note the procedural side of this case, if I can. There are two parts of it that are a little different. I do a lot of police misconduct work, and in this case, the plaintiff moved for summary judgment on line 11. That, of course, is a tactical decision. It is one that the plaintiff takes in the hopes of having that great moment when the judge tells the jury, before the judge tells the jury, your job is to determine the damages. I already determined the liability. Now, the second unusual procedural aspect of this case is that my client won that motion in front of the Honorable Judge Weiss. She said that's why there was no arguable probable cause for this arrest. She prepared for trial. Two weeks before trial, she called. She was busy. She transferred the case to Judge Walz. During the minute it was in my eye for the acknowledgement, it was an interrogatory decision. We tried the case. At the end of the case, I still had my summary judgment ruling in my favor. At that point, opposing counsel moved for a Rule 15 ruling in his favor, judgment as a matter of law for the defendants. There then ensued, and you can read it in the transcript, I think it's about 45 pages long, an extremely detailed discussion. This is at the conclusion of the evidence. At the end of your test? No, sir. It was at the end of all the evidence. I think there was a brief, however there was much evidence of the defendants. Commonly in these cases, the plaintiff calls the defendant on the stand himself, and then the cross-examination pretty much wraps up. But it was at the end of all the evidence. But that's when the meat of the Rule 15 happened. Now, during that discussion, I argued very strenuously that the court should keep in place the ruling of the prior district judge. Now, that ruling had said it was subject to hearing the evidence and the evidence might come in differently. I asserted this court that the evidence did not come in differently. And then what really happened was that we called a witness who was a prosecutor, a Mr. Fanning, who had signed the information. And he said, oh, I think this was case disturbed. And Judge Ross stated during this long colloquy at the end of the day that he thought, yes, that really is important. And I think that's where the error happened in this case. The reason I think that is that the judge allowed Officer Fanning, Officer Prosecutor Fanning's opinion of the case to influence his ruling on the law. But in fact, there was no arguable probable cause in the evidence whatsoever for the arrest of Stephen Hoffmeier for anything. And if we look at the argument and some of the judgment documents, testimony, there's absolutely no testimony he resisted arrest. So it comes down to the peace disturbance. If we look at the peace disturbance, it comes to this issue of fighting words. And under the case law, if I may, I want to read just one sentence from this Tinker case. That was one that was replaced by another right here at City Hall. And there were protesters on the issue of lead paint. And the lady basically used death threats to an officer when she was trying to make blankets for the protesters who were going to stay the night. And the court said, and it was referring to the United States Supreme Court opinions, the problem arises principally when a person has been convicted of peace disturbance where the factual setting involved loud, insulting, obscene, offensive, or appropriate language rather than assaulting, striking, fighting, or physical contact with another person. So I don't have any quarrel with the peace disturbance statute in Missouri. I think it's written exactly right. The words have to be fighting words. They have to be I'm going to punch you in the nose right now kind of words as opposed to insulting, obscene, which is particularly in this case stated and allowed to be the first one. I need to cover this issue of Rule 50 and the duty of the party to defend the summary judgment ruling in a Rule 50 motion. What I submit to the court is that we really did that in this long discussion. I mean, I argued forcefully to maintain a summary judgment ruling. And then at the very end, the last thing the court said was, he said, well, I'm taking it away. Now, as I said in my brief, I should have leapt up and said, oh, it's on now, Rule 50, Rule 50, Rule 50, that the substance of the conversation that had gone on for the prior 30, 40 minutes was precisely directly related to Rule 50 issues. So I think it would have been superfluous to say the word. So with your with your summary judgment order in hand before you go to trial, how was the test trial? Did you present evidence as to viability or did you go into the trial assuming that you already had a decision as to viability? Well, here's the here's how it shakes out. There were two plaintiffs. It was kind of a long story, a lot of details. So over a couple of days of witnesses, we had to cover all the cases. The judge had denied summary judgment for my other client on the theory that he could have been arrested for resisting arrest. There was a factual dispute over whether he had constructed knowledge that the officer is trying to arrest him, which he did, and he would be guilty of resisting arrest. So we tried all the facts of the case. But I think the facts of the case came in as they had during the position. There was no moment in this trial when the witness said something different than he said in his deposition. I think that just didn't happen. And what you would want to think of Clarence Darrow, impeaching a witness with a piece of media said exactly what they said before me. That's what happened. If I may, I've got five minutes left. I'll take two very brief points. This special interrogatory issue. I recognize that I'm not entitled to a reversal. I'm asking this court to note, as a Peterson, that if there's one little tiny aspect of the case, factually, it's dispositive of the law. The trial judge should submit an interrogatory that says precisely the factual question that needs to be answered. And, of course, I think in the Ninth Circuit, they love these special interrogatories. There are reasons that's often pointed out. I think they're very effective. And I'm asking this court rules in my favor on this first interrogatory issue. It adds that. I'll just say one more very brief thing, which is that it is possible that the jury found that Mr. Wicklund did not resist arrest, but did have a proper arrest for piece of service. So it's possible the jury completely misinterpreted the law because the judge misinterpreted the law. And that's why I need to retry the entire case that we talked about. If I may reserve the rest of my time, if there are no questions at this time. You may proceed. Thank you. Thank you. Good morning. Good morning. You may proceed. May it please the court. Plaintiffs are seeking to overturn and cast aside a jury verdict after a full trial on the merits. In the verdicts case, plaintiffs find reinstated in the laboratory room and granted partial summary judgment on some of the plaintiff's claims. The plaintiff's desire to reward the jury's verdict should be rejected because interlocutory rules, like the disposition of the summary judgment in motion, are not appealable after a full trial on the merits. And plaintiffs have cited no legal authority to negate that fundamental principle on these facts. And the plaintiff decides that the summary judgment comes after they fail to follow the procedural rules that are required. After the summary judgment in motion was vacated by Judge Ross, he should move for judgment as a matter of law. The simple fact is he did not. The Eighth Circuit has made a clear argument. But as you said, he wouldn't. If he wouldn't, the fault should be put on him for a 15-year motion or whatever he was required to do. What did he fail to do that he should have done? He failed to ask for judgment as a matter of law. While the discussion he's making reference to was give and take between myself and the court as to whether that summary judgment rule should be vacated, given the evidence that had been presented before the jury, Mr. Schock, after he was made aware that the ruling was going to be vacated, failed to pursue the requirement. What was the effect of Judge Fleiss's ruling? What was the effect? I'm not sure. What did she find? What did she find? She found that there was no problem. There was no problem at all. That's a question of law for the court. At the point of the summary judgment ruling? Yes, Your Honor. But at the point after the evidence had been heard, Judge Ross indicated that there was further information that had been brought forth that indicated… Then why did Judge Fleiss, again, bother to make that judgment? I'm sorry, Your Honor? Why did Judge Fleiss, again, make the effort to make such a judgment if it was an absolutely unforeseen effect? It was a forced effect at the time it was made. But a certain law is clear. After a jury trial on the merits, the summary judgment ruling, whatever it might be, is superseded by that verdict. And that's exactly what happened here. Now, so what do you think that the counsel or the plaintiff should have done to make sure that that favorable summary judgment order was fully in at the trial? I mean, what does this bring to me that we have a summary judgment decision 5 July early? And then when we got to trial, we were trialed in the middle of it. What should the plaintiff have done differently to protect the summary judgment order? I think the plaintiff could have, going into trial, limited the issues in some form or fashion. I've never faced that situation. I've never fought that piece of it through. But it seems to me that through rulings eliminating or when the evidence was presented with respect to issues of damage, seeking to eliminate the instruction that the evidence could be considered solely for purposes of damages, perhaps that is an avenue that could have been pursued. What I do know is this, that when Judge Ross took away that summary judgment ruling, finding that after hearing the testimony, he was convinced that there were material disputes of fact, that plaintiffs did nothing to reassert according to the procedural rules and say that I want to make sure I preserve this issue and I'm making a Rule 50 motion for judgment as a matter of law. That never happened. And this Court has addressed similar issues, the acute case, and in fact, in E, this Court said that we do not reward litigants who fail, whether inadvertently or intentionally, to exercise their rights under federal procedure. In other words, if this were a trial, if it were a trial, the only thing we're trying on our hands at this point is the damages. Should we have any question whatsoever about the lack of probable causes of the issue? If he could have approached that, there were other claims that were presented. There was a malicious prosecution claim that had not been ruled on that summary judgment. And there was also the resistance interfering with the detention with respect to Mr. Wiggum and his being tried as a liability as well. Back to the lack of probable cause, how was the testimony different in the trial from that which was presented to Judge Wessler? The testimony in the trial was considerably different than what was presented in the trial. For example, Mr. Hoffmeier suggested that he did nothing more than put his head out the door of his housecoat and yell something to the defendant. Hey, fucking communist, get the hell out of here. And then went back inside and closed the door. The testimony at trial, he was outside of the housecoat floor as much as a minute, running up and down the rail, waving at the officer, flipping him off, just like Mr. Wiggum, using not only dropping F-bombs right and left, MF-bombs, the phrase kamikaze, and all of this in the presence of people on a nearby dock. And Sergeant Porter is sitting on the water, listening to this tirade, looking at the people on the dock, including a mother with young children. He's looking at them, they're looking at him, they're looking at what's going on outside that boat or on the railing of that boat. And that's the basis for his belief that he had probable cause for peace disturbance. And it flowed exactly from the statute which said, offensive language used, that's without question. As early as Chip Lindsay in 1942, the United States Supreme Court said they didn't need an argument to understand that those kind of words, or fighting words, when they were used in that case, goddamn fascist and goddamn communist. Now, I'll agree in 1942, those words, the year after Pearl Harbor, had a little more of an edge to them. But as we move forward, society is forcing, Missouri court, now the very words that were used by the plaintiffs in this case, the Slavota case I'm referring to, are inarguably fighting words. The words themselves were directed in a face-to-face manner to the officer, thus reading that in a statute. But the words used are likely to produce immediate violent response, not from the officer, not from the people on the dock, but from a reasonable person. And I would posit to this court that the tirade and the language that is being directed at that officer, inarguably would produce, or be likely to produce, an immediate violent response from someone. Well, how is it that that issue, that version, of Vance was not referred as boss on the summary judgment? There were disputes of fact. The defendants filed a summary judgment motion as well, in hopes of gaining qualified immunity. But when I looked at Mr. Schott's response to my recitation of the fact, there was no sense in forcing the court to analyze it. There were clearly disputes of fact. When you said that, in answer to Judge Weldon's question, you said that the testimony filed was far different from the version that was submitted to Judge Bossett. That is correct. So how, why, why is that? The fuller version that I'm explaining to the court now was part of the defendant's summary judgment motion. But after I reviewed the response to our facts that the plaintiff submitted, I went through our summary judgment motion recognizing that we were not going to be able to prevail. And I was asking the district court to simply engage in a useless act. The motion was going to be denied. It was going to have to be decided by a jury. And it was decided by a jury. They heard all of this testimony. They heard Mr. Schott's argument. They heard my client's and my argument. And they had a verdict director in front of them that posited the law correctly. And they came back with the conclusion that there was a probable cause for Sergeant Porter to believe that a disturbance of the peace under Missouri law had, in fact, occurred. Now, I'd like to turn, if I may, to one of the plaintiff's other arguments. Now, he's attacking the jury verdict, at least asking the court to take into consideration this failure to not submit a special prerogatory. Now, generally, claims for instructional error are reviewed under the use of discretion standard. But that's not the case here because, once again, it was never properly preserved. That special prerogatory was never submitted during the instructional conference. It was discussed at various points. But even during the formal instructional conference, when Judge Ross asked his under-parting app other instructions they want submitted, plaintiffs were silent. They never submitted that special prerogatory for consideration. Thus, the only review that they have available to them is for plain error. And the standards for plain error aren't even argued in the plaintiff's brief. They're never in something. Plain error requires that the district court deviate from the legal rule. Plaintiffs cite them. The error must be clear under current law. They cite it in such a case. And finally, the alleged error has to affect substantial rights in which the court, in this instance, has to amend an article determinative that's going to lead to a different result. But that wasn't the case here. The special prerogatory was duplicative of the verdict record. And Mr. Schott effectively argued from the evidence his point of view in that case. The special prerogatory was unnecessary and it was duplicative. Finally, plaintiffs also suggest that they had a motion for a new trial, but that shouldn't have been granted. But that's not out of merit here. The jury was never aware of the summary judgment ruling that had occurred by Judge Fleisig, nor were they aware that it had been taken away. So the accusation that doing that somehow tainted the entire trial, including the verdict, just doesn't stand. In addition, plaintiffs alternatively seem to be asking for something like a Rule 60B motion in the nature that they were unfairly surprised that the summary judgment ruling was taken away. But that's not the case. I advised Mr. Schott well before trial that I intended to seek some relief from that summary judgment ruling. He was aware that that was done. And when that time came, they didn't ask for this trial. They didn't ask for any other relief. They may not have believed that that summary judgment ruling was going to be taken away. They might have been so confident in it that they thought it was going to stand. But they didn't plan for the contingency. And if they didn't do that, that's a failure on their part. It is not a justification to kick the jury's verdict to the curb in this instance and give the plaintiffs a new trial as to all matters. If there are any questions, do you have any answers? Mr. Schott called the prosecutor to testify. He did? He did. I believe the prosecutor was going to say that you could not have peace disturbance against a police officer or perhaps that there was not probable cause. I don't know exactly what he was trying to establish. He did not give that testimony. It was not a testimony that I elicited, Your Honor. Thank you. If I may first answer your question as to why I called Officer Fannigan. I called Officer Fannigan because I wanted the jury to find out that what he was saying was wrong. I expected, when the jury heard the judge say, I am ruling in favor of a plaintiff, Hothmeyer, on the liability issue that the jury would have been upset and understood that there was an appearance in this case that there was a closing of the loop and a circling of the wagons on behalf of law enforcement. And so, I mean, not exactly what we've done, but I did it on the expectation of a correct ruling from Judge DeFalz. I do disagree respectfully with Mr. Leigh Schott on the fact that the evidence came in differently. How long the man spent outside was not the issue. The issue is what he said, which was pretty much the same thing. I want to note just one factual, two factual details. Mr. Leigh Schott was absolutely right when he told me he was going to challenge the summary judgment ruling. I think he might have implied to the court that our discussion with the judge was only between him and the judge. That long discussion, both parties had numerous chances to go back and forth. It was a full dialogue. I'd like to address this bias-counter issue. I think that's an important aspect of the peace disturbance. It requires face-to-face The evidence submitted in the exhibits will show that the way this boat stuck out in the water, if there were people on the dock, which we have to concede, because it's consistent with the verdict, if they were behind, even though I was meeting with someone in the second row back there, that's not face-to-face. I've been reminded, if people are offended, if they're in a young family, that's a bad thing. Nobody wants that to happen at all. We want people to get along and be polite to each other. It doesn't make it a crime. That's the problem that the defendants have on this whole issue of the probable cause. It has to be a crime. If you read the statute face-to-face, it also requires an immediate response. Well, each one is judged under the circumstances of the case. It's hard to imagine an immediate response from someone who's 50, 60, 70 yards out of the middle of the river on a completely different boat. The question that I would have, on that area of the water, whatever jurisdiction it is, is it against the law to be standing on your boat when you need help? I know no law that is... I know nothing that makes that against the law. It's never been in the case in any way. Keep in mind, this boat does not move. It's a place that's fully anchored. And this officer had worked in this section of the river for years, and this boat had been there for years, and the officer going up and down can be certainly aware of that. Have there been any previous acrimonious contact between the two people that were shouting at each other about who was right and who was wrong, or being out there patrolling, doing that kind of work on this busy, navigable stream, whatever? If I might correct one of you, in association with your question, I don't think the officer shouted back. So if you imply they were shouting at each other in your question, I don't think that's correct. Was that difficult? Yeah. I mean, what was it? Even on a small quiet river, let alone a bigger, quiet corner of the river? Yeah. So, it's my understanding that my clients have been irritated at it before, but have never expressed their irritation in prior incidents. Does that answer your question, sir? As to whether there could have been prior shouting or interaction, I don't. I believe the answer to that is no. If there are no more questions, I'm so appreciative of the time today. That's all my clients. Thank you.